**Ira NASH, Jr., Petitioner-Appellee,**

**v.**

**W. J. ESTELLE, Jr., Director, Texas Department of Corrections, Respondent-Appellant.**

**No. 75–3772.**

United States Court of Appeals, Fifth Circuit.

June 21, 1979.

John L. Hill, Atty. Gen., John Pierce Griffin, Asst. Atty. Gen., David M. Kendall, First Asst. Atty. Gen., Joe B. Dibrell, Jr., Chief, Enforce. Division, Robert E. DeLong, Jr., Asst. Attys. Gen., Austin, Tex., for respondent-appellant.

Michael A. Hatchell, Tyler, Tex. (Court-appointed), for petitioner-appellee.

Before BROWN, Chief Judge, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, MORGAN, CLARK, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN and VANCE, Circuit Judges.*

CHARLES CLARK, Circuit Judge:

Ira Nash, Jr., was convicted in a jury trial of murder with malice and sentenced to imprisonment for one hundred years. The district court, without holding an evidentiary hearing, granted Nash's petition for a writ of habeas corpus on the grounds that a written confession introduced against Nash had been obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1964). A panel of this court reversed the grant of habeas corpus in a 2–1 decision. *Nash v. Estelle*, 560 F.2d 652 (5th Cir. 1978). On rehearing en banc, we reverse the grant of habeas corpus relief.

I.

Henry Moore, a taxi driver, was found shot to death in his cab on February 20, 1969, on an unimproved road near the outskirts of Tyler, Texas. Moore's watch and money were missing. A witness placed the petitioner, Ira Nash, in Moore's cab shortly before Moore's body was discovered.

Nash was arrested on May 26, 1969, pursuant to a warrant, and was brought before a magistrate and informed of his *Miranda* rights. While in the custody of the deputy sheriff, Nash orally confessed to the murder

---

* Judges Thornberry and Morgan, as members of the en banc court as they were qualified to be, 28 U.S.C.A. § 46(c), participated in the oral argument of the case en banc and the en banc conference. Subsequently, the Omnibus Judgeship Bill, Public Law No. 95–486 (95th Congress), was approved October 20, 1978. In view of this, Judges Thornberry and Morgan elected not to participate further in this decision.

of the cab driver. The oral confession was not introduced at Nash's state trial and is not in dispute here. On the morning of June 2, 1969, Nash was brought into the office of Assistant District Attorney F. R. Files, Jr., to discuss the impending murder charge. During the course of their tape recorded conversation Nash again confessed to the murder; he later signed a written statement prepared from that recorded conversation. The next day Nash and Files drove to the murder scene and Nash confessed yet a third time to his crime. A written statement derived from that inspection was prepared and it too was signed by Nash.

## II.

The dispute on appeal is whether District Attorney Files violated Nash's right to the presence of counsel during the course of their initial June 2 conversation. Resolution of the issue turns on the interpretation to be placed on the following dialogue between Nash and Files:

FILES: Ira, my name is Buck Files. Files. It is written right here where you can see it. I work up here in this office. I am a lawyer. I want to talk to you this morning, if you wanted to talk to me. Before we talk, did you ever play any football? Baseball, or anything like that? Did you ever watch it played?

NASH: I played a little in High School.

FILES: You know, every ball game has some rules that you got to play by. Well, one of the rules is, of course, that I've got to tell you the same thing that that Judge told you the other day, before we can have any talking. You understand?

NASH: Yes, sir.

FILES: Please be sure and speak up loudly enough where that microphone can hear. Pull your old chair in a little bit. Okay. Now, before we start, let me tell you something. If you want to go to the bathroom, smoke a cigarette, you want some coffee, you let me know, because there is no problem on doing it. Now, the Judge read the whole pink paper to you the other day, and it is just a rule that I need to go over the same thing with you again. You understand that you have the right to remain silent; that anything that you say can and will be used against you in a Court of Law?

NASH: Yes, sir.

FILES: You understand?

NASH: Yes, sir.

FILES: You have the right to talk to a lawyer and have him present with you while you are being questioned. You understand that, don't you?

NASH: Yes, sir.

FILES: If you can't afford to hire a lawyer, one will be appointed to represent you before any questioning, if you want one. You understand that, don't you?

NASH: Yes, sir.

FILES: And you can end this interview at any time. You understand?

NASH: Yes, sir.

FILES: If you get tired of talking to me, if you don't like something I say, you don't like it, you just don't like anything about it, you can just tell me to be quiet, that you don't want to talk to me any more. You understand?

NASH: Yes, sir.

FILES: Now, I want to talk to you about this shooting, where the taxicab driver got shot. This is what I am interested in. I am not interested in burglaries you may have committed some place. I'm not interested in any robberies. I am not interested in marijuana. I'm interested in that taxicab shooting. You understand?

NASH: Yes, sir.

FILES: Do you want to talk to me about this?

NASH: Yes, sir.

FILES: You understand everything I've told you?

NASH: Yes, sir.

FILES: And nobody downstairs has threatened you in any way to get you to come up here and talk to me?

NASH: No, sir.

FILES: Be sure and speak up loudly.

NASH: No, sir.

FILES: No one has promised you anything if you would come up and talk to me, have they?

NASH: No, sir.

FILES: You understand that nobody can threaten you and nobody can promise you anything. You understand that, don't you?

NASH: Yes, sir.

FILES: I've got a form here. I just read you the top half of it about the right to remain silent, a lawyer, end the interview and all that. And down here at the bottom it says, "I have been warned about my rights by" and there is a blank where we can fill in my name. And then this thing says, "I understand that I don't have to tell him anything and what I do say can be used against me in Court. I do not want to have a lawyer present at this time—just what you told me, up here.

NASH: Yes, sir.

FILES: Now, if you want to talk to me about this thing, it's just one of the rules I need you to fill in where it says that, and if you understand what I told you—this is sort of like going over it 17 times, but it is just a rule. If you understand that you don't have to tell me anything and what you do say can be used against you in Court, and if you don't want to have a lawyer present right now, then I need you to sign this. Okay?

NASH: Yes, sir.

FILES: Oh, let's see if we can find a fountain pen. Here's one. If you will put my name down there on this line just like it's written. How far did you go in school, Ira?

NASH: I went to a senior, but I didn't march through.

FILES: Where did you go to school? Emmett Scott?

NASH: I went to school in Dallas.

FILES: What school up there?

NASH: I went to Madison for a while, and then I went to Lincoln. Lincoln High.

FILES: F-i-l-e-s. I haven't heard you read. Just to show me that you can read, I want you to read that thing out loud to me there.

NASH: I don't read too well, you know.

FILES: Let's see what you can do.

NASH: "I understand that I do—I don't have to tell him anything, and what I say can be used against me in Court. I do not want to—I mean I do not want to have a lawyer present in Court, I mean at this time.

FILES: Then the place under that is—

NASH: If I want a lawyer present, I just put down I want him present?

FILES: Please just tell us about it. Any time we are talking and you decide that you need somebody else here, you just tell me about it and we will get somebody up here.

NASH: Well, I don't have the money to hire one, but I would like, you know, to have one appointed.

FILES: You want one to be appointed for you?

NASH: Yes, sir.

FILES: Okay. I had hoped that we might talk about this, but if you want a lawyer appointed, then we are going to have to stop right now.

NASH: But, uh, I kinda, you know, wanted, you know, to talk about it, you know, to kinda, you know, try to get it straightened out.

FILES: Well, I can talk about it with you and I would like to, but if you want a lawyer, well, I am going to have to hold off, I can't talk to you. It's your life.

NASH: I would like to have a lawyer, but I'd rather talk to you.

FILES: Well, what that says there is, it doesn't say that you don't ever want to have a lawyer, it says that you don't want to have a lawyer here, now. You got the right now, and I want you to know that. But if you want to have a lawyer here, well, I am not going to talk to you about it.

NASH: No, I would rather talk to you.

FILES: You would rather talk to me? You do not want to have a lawyer here right now?

NASH: No, sir.

FILES: You are absolutely certain of that?

NASH: Yes, sir.

FILES: Go ahead and sign that thing.

In granting Nash's habeas petition, the district court ruled that Nash had invoked his constitutional right to the presence of counsel at the interrogation which produced his first written confession and that as a matter of law that right to counsel could not be waived.

### III.

■ *United States v. Priest,* 409 F.2d 491, 493 (5th Cir. 1969), held:

Where there is a request for an attorney prior to any questioning, as in this case, a finding of knowing and intelligent waiver of the right to an attorney is impossible. . . . [T]he suspect has an absolute right to delay interrogation by requesting counsel. If such a request is disregarded and the questioning proceeds, any statement taken thereafter cannot be a result of waiver but must be presumed a product of compulsion, subtle or otherwise.

We construe *Priest* to bar inquiry as to waiver when, prior to any questioning, the suspect makes an unequivocal request for an attorney's presence, as was done in *Priest,* and when the request is disregarded and the questioning proceeds. *See United States v. Massey,* 550 F.2d 300 (5th Cir. 1977). Our cases subsequent to *Priest* have also made it clear that *Priest* is inapplicable when a suspect spontaneously incriminates himself after questioning has ceased. When police stop interrogation as required, admissions that later come at the initiative of a suspect are subject to the traditional analysis for voluntariness. *See United States v. Anthony,* 474 F.2d 770 (5th Cir. 1973); *United States v. Hodge,* 487 F.2d 945 (5th Cir. 1973); *United States v. Cavallino,* 498 F.2d 1200 (5th Cir. 1974).

■ The same principle governs when, as here, a suspect who has been informed of his rights expresses both a desire for counsel and a desire to continue the interview without counsel. Where the suspect's desires are expressed in such an equivocal fashion, it is permissible for the questioning official to make further inquiry to clarify the suspect's wishes.

*Miranda* itself contemplated that when confronted with his options a suspect might be indecisive on whether an attorney is desired:

" 'If [a suspect] is indecisive in his request for counsel, there may be some question on whether he did or did not waive counsel. Situations of this kind must necessarily be left to the judgment of the interviewing Agent.' "

384 U.S. at 485, 86 S.Ct. at 1633. While the suspect has an absolute right to terminate station-house interrogation, he also has the prerogative to then and there answer questions, if that be his choice. Some persons are moved by the desire to unburden themselves to confessing their crimes to police, while others want to make their own assessment of what to say to their custodians. "[A] blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests." *Michigan v. Mosley,* 423 U.S. 96, 102, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975). When, as in the case at bar, a desire for immediate talk clearly appears from the suspect's words and conduct, but he also states he wants a lawyer (*i. e.,* "I would like to have a lawyer, but I would rather talk to you"), it is sound and fully constitutional police practice to clarify the course the suspect elects to choose. The precedent of *Priest* does not bar this clarification.

■ This is not to say that an interrogating officer may utilize the guise of clarification as a subterfuge for coercion or intimi-

dation. As the Supreme Court reiterated in *Brewer v. Williams*, 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977), in examining an alleged waiver of the right to counsel "courts indulge in every reasonable presumption against waiver." *Miranda* stated that a suspect may waive effectuation of his rights but only if "the waiver is made voluntarily, knowingly and intelligently." 384 U.S. at 444, 86 S.Ct. at 1612. The critical factor is whether a review of the whole event discloses that the interviewing agent has impinged on the exercise of the suspect's continuing option to cut off the interview.

Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting.

*Michigan v. Mosley*, 423 U.S. at 103, 96 S.Ct. at 321, 326. *See also North Carolina v. Butler*, —— U.S. ——, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979).

### IV.

Since *Priest* does not apply to a suspect who voluntarily chooses not to invoke his right to the presence of an attorney during interrogation, the outcome of Nash's habeas petition turns on a factual analysis of his interview with Files. Solely on the basis of reading the interview transcript, the district court concluded that Nash asked for an attorney to be present during questioning. Reading the same transcript, we disagree with the inferences drawn by the district court, and conclude that Nash never requested an attorney's presence during questioning, but merely sought assurances that his right to counsel at later stages of the criminal process would not be waived if he followed his desire to discuss his involvement in Moore's death with Files. Since the district court had nothing more before it than the same transcript we now review, our interpretation of the interview is unconstrained by the usual strictures of the clearly erroneous standard. *Datamedia Computer Service, Inc. v. AVM Corporation*, 441 F.2d 604, 608 (5th Cir. 1971); *Caradelis v. Refineria Panama, S.A.*, 384 F.2d 589 (5th Cir. 1967); *Hillard v. Commissioner of Internal Revenue*, 281 F.2d 279, 282 (5th Cir. 1960).

At the outset of our analysis of the Nash-Files interview, we note that Files, as an officer of the court and an official in the district attorney's office for the State of Texas, is entitled to a presumption that he discharged his duties with regularity and in compliance with the Constitution. It is axiomatic that a "presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Chemical Foundation*, 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926). *See also Citizens To Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971). The presumption has been frequently applied to the actions of all sorts of governmental officials, and the Supreme Court has specifically noted its application to state prosecutors. *Dombrowski v. Pfister*, 380 U.S. 479, 484, 85 S.Ct. 1116, 1120, 14 L.Ed.2d 22 (1965).

The circumstances surrounding Files' interview of Nash fully support the assumption of both subjective good faith and objectively proper conduct during his colloquy with Nash concerning the right to counsel. It was Files' choice to make a permanent record of every word exchanged between the two men. Nash was a man who had already orally confessed to murdering Henry Moore when he came into Files' office for the purpose of making an official written declaration of the events concerning his crime. Nash's apparent willingness to talk negates the existence of any motive for manipulation by Files. Moreover, it would have been simple-minded for Files to have attempted to work some insidious stratagem during an interrogation he deliberately chose to preserve on magnetic tape.

We are not, as the district judge was not, required to determine what took place at the interview from conflicting testimony of those who were present. There is no dispute as to the exchange that took place between Files and Nash. The tape recording settles those facts, and each party relies upon the accuracy of that record. Nothing contained in this opinion shall be taken as authorizing the fact finder to accord the testimony of a government lawyer or law enforcement officer any particular weight on account of his office or to assume that his version of regularity is true when the resolution of conflicts in evidence is required.

From the beginning to the end of the transcript, Files' conduct reveals a proper sensitivity to Nash's rights. The transcript records that Nash never had an intention of doing anything other than making formal his prior oral confession to the murder of Henry Moore. Files made it amply clear that Nash could cut off questioning at any point and consult an appointed lawyer. He repeatedly explained that option to Nash and even took the precaution of having Nash read the written statement of rights aloud. While reading the statement of his rights, Nash reached the portion describing his rights to counsel and asked:

> If I want a lawyer present, I just put down I want him present?

Files' response was:

> Please just tell us about it. Any time we are talking and you decide that you need somebody here, you just tell me about it and we will get somebody up here.

Taken in its entirety, this response cannot fairly be interpreted as a subtle attempt to dissuade Nash from exercising his right to immediate counsel. "Please just tell us about it" was followed with yet another reminder that counsel was promptly available for the asking.

These exchanges about a lawyer followed:

NASH: Well, I don't have the money to hire one, but I would like, you know, to have one appointed.

FILES: You want one to be appointed for you?

NASH: Yes, sir.

FILES: Okay. I had hoped that we might talk about this, but if you want a lawyer appointed, then we are going to have to stop right now.

NASH: But, uh, I kinda, you know, wanted, you know, to talk about it, you know, to kinda, you know, try to get it straightened out.

FILES: Well, I can talk about it with you and I would like to, but if you want a lawyer, well, I am going to have to hold off, I can't talk to you. It's your life.

NASH: I would like to have a lawyer, but I'd rather talk to you.

FILES: Well, what that says there is, it doesn't say that you don't ever want to have a lawyer, it says that you don't want to have a lawyer here, now. You got the right to have that lawyer here right now, and I want you to know that. But if you want to have a lawyer here, well, I am not going to talk to you about it.

NASH: No, I would rather talk to you.

FILES: You would rather talk to me? You do not want to have a layer here right now?

NASH: No, sir.

FILES: You are absolutely certain of that?

NASH: Yes, sir.

FILES: Go ahead and sign that thing.

Nash did not enter Files' office fresh from an initial apprehension. Files began the conversation with the expectation that Nash would repeat his confession. Obviously, Files must have been surprised by Nash's statement that he wished to have an attorney appointed. If the word "lawyer" were to be endowed with talismanic qualities, Files would have had to order Nash removed from his office without another word when "lawyer" fell from Nash's lips. However, it is clear from the context of this colloquy that such unrealistic conduct would have denied to Nash his true desire to explain himself and to continue with the in-

terview. Only by improperly assuming that Files was a devious trickster, who desired to subtly manipulate Nash, can the dialogue between Nash and Files be regarded as forestalling Nash's rights. After he was assured by Files that the waiver of a lawyer at the interview did not waive his right to be represented by counsel at arraignment, plea bargaining or trial, and sentencing, Nash twice restated his desire to talk to Files at that very moment.

The presumption of regularity accorded to Files' conduct prevents a parsing of his extemporaneous response for some hint of the "insidious prosecutorial stratagem" discerned by the district court. This is the verbatim transcript of a conversation between a man who knew from the outset that he possessed the right to halt the proceeding at any point and a man who we must presume had a good heart. When read in light of that presumption instead of the incorrect contrary assumption that Files acted on base motives, the transcript discloses he fairly and evenly apprised Nash of his rights. In the bright light of hindsight, different dialogues could be suggested either to fault Files' responses or to put them

beyond question as proper. That is not our responsibility. We must assay the event that actually occurred with the recollection that it took place between real people in a real world. Considering the actors and the setting, the exchange is not infected with a sinister undertone. Files did not violate any right accorded Nash by *Miranda* or *Priest*. The district court erred in granting the writ.

REVERSED.

GODBOLD, Circuit Judge, with whom BROWN, Chief Judge, GOLDBERG and VANCE, Circuit Judges, join, concurring in part and dissenting in part:

The majority opinion contains the seeds of great mischief.

The court correctly holds that there can be no finding of knowing and intelligent waiver of the right to an attorney and the right against self-incrimination where the purported waiver is the product of uninterrupted custodial interrogation that follows an adequately communicated request for an attorney.[1] By endorsing this well defined and limited *per se* rule [2] the court en banc

1. We are not here dealing with the possibility of waiver after an accused invokes his right to silence but does not request an attorney. This issue was dealt with by the Supreme Court in *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). Justice White, concurring, noted that the policy considerations in the two situations are much different. *See id.* at 110 n. 2, 96 S.Ct. at 329 n. 2, 46 L.Ed.2d at 325; note 2 *infra*.

2. Our version of the *per se* rule falls between two extremes sometimes urged. We will not permit inquiry as to waiver unless there has been a temporal break in the custodial interrogation after the request for counsel and before the purported waiver. *Contra Wilson v. Henderson*, 584 F.2d 1185 (CA2, 1978) (inquiry as to waiver permitted in all circumstances). On the other hand, where there has been such a temporal break, we will inquire into whether there has been an effective waiver even if the purported waiver comes before the suspect has actually consulted with an attorney. *Contra Michigan v. Mosley, supra,* 423 U.S. at 109–10, 96 S.Ct. at 329, 46 L.Ed.2d at 325 (White, J., concurring) (if attorney is requested, *per se* rule against waiver until attorney is present). *See Maglio v. Jago*, 580 F.2d 202, 205–06 (CA6, 1978) (discussing but not deciding content of

*per se* rule); *see generally* Stone, *The Miranda Doctrine in the Burger Court*, 1977 Sup.Ct.Rev. 99, 130–31 (summarizing pre-*Mosley* case law). Justice White's argument that questioning must cease until an attorney is present has some force. *See* 423 U.S. at 110 n. 2, 96 S.Ct. 329 n. 2, 46 L.Ed.2d at 325; 31 Vand.L.Rev. 1069, 1074–75 (1978). Moreover, dicta in the *Mosley* majority opinion support this view. *See id.* at 101 n. 7 & 104 n. 10, 96 S.Ct. at 325 n. 7 & 326 n. 10, 46 L.Ed.2d at 320 & 321; *U. S. v. Rodriguez-Gastelum*, 569 F.2d 482, 489–91 (CA9) (en banc) (Hufstedler, J., dissenting), *cert. denied*, 436 U.S. 919, 99 S.Ct. 2266, 56 L.Ed.2d 760 (1978). In any event, our less stringent rule requiring at least an interruption in custodial interrogation after a request for an attorney is compelled by *Miranda* itself.

The *Miranda* rule is designed to dispel the inherent coercion of custodial interrogations and to allow the individual to exercise his free will. *See Miranda v. Arizona*, 384 U.S. 436, 469–70, 86 S.Ct. 1602, 1625, 16 L.Ed.2d 694, 721 (1966). This purpose would be undercut if, after the right to counsel is invoked, interrogation may continue and later be used as the predicate to establish that, without the presence or advice of counsel, the suspect has decided to surrender his right to have that very presence and advice.

has dispelled in this circuit much of the confusion and many of the differences of opinion surrounding this issue in other circuits.[3] Unfortunately, though the court's opinion provides needed clarification in this respect, in other respects it creates precedents that endanger the right of those suspected of crimes to be free from coercive interrogations.

After defining the limited *per se* rule based on our holdings in *U. S. v. Priest*, 409 F.2d 491 (CA5, 1969), and *U. S. v. Massey*, 550 F.2d 300 (CA5, 1977), the court, in a grudging and strained opinion, declines to apply the rule in this case. In so doing, it creates an exception to the *per se* rule, described as "equivocalness," that has the potential for largely undermining the prophylactic effect of the rule and for transferring from accused to interrogator the control over the right to an attorney. Moreover, in attempting to force this case within the contours of this equivocalness exception, the court overlooks crucial facts that show the exception, even if valid, is inapplicable in the present case.

Perhaps more disturbing is the court's approach to the issue of waiver. The court, although recognizing that Nash's confession must be excluded unless the state has carried its heavy burden of showing that his waiver of *Miranda* rights was voluntary,

During an interval between the time when a suspect requests counsel and the time when, after continued interrogation, he changes his mind and foregoes his right, only one objective event has occurred that tends to explain the suspect's subjective change of mind—he has been exposed to further interrogation in a custodial setting, which without regard to its content is, by *Miranda* definition, inherently coercive. The elimination of this type of coercion is precisely the purpose of *Miranda*. The rationale of *Miranda* thus requires, at the least, that before factual inquiry can be made into whether there has been a waiver, there cannot have been a continuation of custodial interrogation after an initial request for counsel and before the later purported waiver.

This analysis is consistent with the Supreme Court's reasoning in *Mosley*, the right to silence case, in which the Court allowed the resumption of questioning only after the passage of a significant period of time. *See* 423 U.S. at 103–06, 96 S.Ct. at 326–27, 46 L.Ed.2d at 321–22.

knowing and intelligent, adopts an approach that misconstrues the applicable precedents by focusing inquiry on the subjective motivations of the interrogating officer. Also, by applying the administrative presumption that a public officer performs his duties with regularity and in compliance with the Constitution, the majority opinion threatens the established body of law governing the right of suspects in custody to be free from the effects of even subtly coercive police interrogation techniques. Finally, in an error that pervades the opinion, the court, sitting as fact-finder, ignores the statutory law that controls federal-state relations in habeas corpus cases and fails to consider much of the evidence.

## I.

Initially, let us examine the structure of the majority opinion. In Part III the court, after reaffirming the *Priest per se* rule, states that if the suspect's request for counsel is "equivocal," further inquiry into waiver may be made by the courts, at least when after the equivocal request the interrogator does nothing more than "make further inquiry to clarify the suspect's wishes." The court then states, without elaboration, that Nash's request for counsel was equivocal. Thus, the *per se* rule barring judicial inquiry as to waiver was never triggered.[4]

3. *See, e. g., Wilson v. Henderson*, 584 F.2d 1185 (CA2, 1978); *Maglio v. Jago*, 580 F.2d 202 (CA6, 1978); *White v. Finkbeiner*, 570 F.2d 194, 200 n. 3 (CA7, 1978); *U. S. v. Rodriguez-Gastelum*, 569 F.2d 482 (CA9) (en banc), *cert. denied*, 436 U.S. 919, 99 S.Ct. 2266, 56 L.Ed.2d 760 (1978), *noted in* 31 Vand.L.Rev. 1069 (1978); *U. S. v. Charlton*, 565 F.2d 86 (CA6, 1977); *U. S. v. Grant*, 549 F.2d 942 (CA4, 1977); *U. S. ex rel. Sanders v. Rowe*, 460 F.Supp. 1128, 1134–35 (N.D.Ill.1978) (collecting cases).

4. At no point does the court explicitly discuss whether Files, the interrogating official, limited his inquiries, after Nash's "equivocal" request for counsel, to clarification of Nash's wishes. Such an inquiry is necessary even under the court's own test, and, as discussed below, would produce the conclusion that Files' questions were not so limited.

Having disposed of the *per se* rule, the majority comes to the question whether Nash's waiver of his right to counsel was "made voluntarily, knowingly, and intelligently," as *Miranda* requires. *See* 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 707. The court explicitly recognizes that *Brewer v. Williams*, 430 U.S. 387, 402–04, 97 S.Ct. 1232, 1241–44, 51 L.Ed.2d 424, 438–40 (1977), requires that the "courts [indulge] in every reasonable presumption against waiver" in deciding whether the state has carried its "heavy burden" of proving effective waiver of the right to counsel.

At this point the majority makes a jump in logic that is hard to follow. The district court expressly reserved the issue of waiver. The court en banc does not remand for determination of this question, as the panel would have done. And, instead of facing the question whether Nash's waiver was made voluntarily, knowingly and intelligently, the court instead concludes that the dispositive issue "is whether a review of the whole event discloses that the interviewing agent has impinged on the exercise of the suspect's continuing option to cut off the interview." After thus erroneously equating "voluntary, knowing and intelligent waiver" with the absence of official action that forestalls the suspect's invocation of his right to counsel, the court, in Part IV, concludes that there was no such action by Files because (1) the court can tell from reading the transcript that Nash's "true desire" was to talk without a lawyer and therefore none of Files' statements could have had the effect of forestalling Nash's nonexistent wish to have counsel present, and (2) there is an unrebutted presumption that Files, as a public officer, acted in good faith and in compliance with the Constitution. The majority thus sweeps away the

issue of the effectiveness of Nash's waiver and reverses the grant of the writ.

## II.   Whether the *per se* rule is applicable

It is clear that Nash, as the district court found, made an unambiguous request for counsel during this exchange:

> NASH: *If I want a lawyer present,* I just put down [on the waiver form] *I want him present?*
>
> FILES: Please just tell us about it. Any time we are talking and you decide that *you need somebody else here*, you just tell me about it and we will get somebody up here.
>
> NASH: Well, I don't have the money to hire one, but *I would like,* you know, *to have one appointed.*
>
> FILES: *You want one to be appointed for you?*
>
> NASH: *Yes, sir.*

(Emphasis added.)

As I understand it, the court accepts that Nash requested counsel, since in Part III the opinion refers to the suspect's "express[ing] . . . a desire for counsel" and "stat[ing] he wants a lawyer."[5] Any other conclusion would be untenable on a reading of Nash's words, inconsistent with Files' own testimony about what he understood Nash to have said, and not permitted by 28 U.S.C. § 2254(d), since the state trial court made a finding of fact, binding on federal courts, that Nash requested counsel.[6]

### A.   Equivocalness of Nash's request for counsel

The court makes no claim that Nash's request for counsel was *ambiguous,* that is,

---

**5.**   *See* note 23 *infra.*

**6.**   The Texas trial court made this specific finding of fact: "Thereafter, the Defendant stated that he would like for a lawyer to be appointed to represent him." The state has not suggested that it disagrees with or challenges this finding by the state trial court. 28 U.S.C. § 2254(d) makes this finding, made after a full evidentiary hearing during which the trial judge heard

the live testimony of both Files and Nash, binding on the federal courts. The language of 28 U.S.C. § 2254(d)–(e) does not seem to contemplate a state's attempt to challenge the findings of fact made in state courts. In any event, the state has not attempted to show that any of the conditions listed in § 2254(d) under which federal courts may ignore state fact findings are present in this case.

internally unclear.[7] Rather, it finds that Nash's position was "equivocal" in that he expressed conflicting desires to have counsel and to continue the interrogation without counsel, so that Files was entitled to continue the interview by asking "clarifying" questions. *What is, of course, wrong with this at the threshold is that Nash's statements concerning desire to continue without a lawyer were the fruits of continued questioning by Files after Nash requested counsel.* The supposed need for clarification arose from interrogation continued after it was bound to cease. The opinion neither suggests nor even addresses any justification for Files' continuing the interrogation in the first instance but employs the fruits of the continued questioning to find that Nash was equivocal.

Putting aside for the moment whether there should be an "equivocalness" exception to the *Priest per se* rule, the exception is not applicable in this case because there was no equivocalness inherent in Nash's initial request for counsel. A reading of the transcript itself reveals that at no point before Nash's first request for the presence of counsel had he indicated a desire to waive his right to counsel. He had indicated that he understood his right to an attorney and he had indicated a desire to talk to Files, but he had not yet expressed a desire to talk with Files without the assistance of an attorney. When Nash was first requested to make a waiver of his right to an attorney, his immediate response was to request the presence of counsel:

FILES: . . . . I haven't heard you read. Just to show me that you can read, I want you to read that thing out loud to me there.

NASH: I don't read too well, you know.

FILES: Let's see what you can do.

NASH: "I understand that I do—I don't have to tell him anything, and what I say can be used against me in Court. I do not want to—I mean I do not want to have a lawyer present in Court, I mean at this time.

FILES: Then the place under that is—

NASH: If I want a lawyer present, I just put down I want him present?

FILES: Please just tell us about it. Any time we are talking and you decide that you need somebody else here, you just tell me about it and we will get somebody up here.

NASH: Well, I don't have the money to hire one, but I would like, you know, to have one appointed.

FILES: You want one to be appointed for you?

NASH: Yes, sir.

Although Nash subsequently receded from his request for an attorney and expressed inconsistent desires (*i. e.,* "I would like to have a lawyer, but I'd rather talk to you."), this after-the-fact change of position is not relevant to a determination whether Files thought that Nash was equivocal about his desire for an attorney at the time

---

7. Without question, if a suspect utters an "ambiguous" statement so indecisive or unclear that the interrogating officer is unable to tell whether the suspect is in fact asserting the right to counsel, the officer must be free to ask questions in order to ascertain what the defendant means. *See U. S. v. Riggs*, 537 F.2d 1219, 1222 (CA4, 1976). Indeed, as the majority points out, the *Miranda* Court recognized the necessity for the exercise of some discretion by the interrogator in such situations. *See* 384 U.S. at 485–86 & n. 55, 86 S.Ct. 1633–34 & n. 55, 16 L.Ed.2d at 730. *But see North Carolina v. Butler,* —— U.S. ——, ——, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979) (Brennan, J., dissenting).

This is not to say that after an ambiguous statement that might be construed as a request for counsel, the interrogator is free to ignore the request and proceed with the interrogation.

Instead, he should attempt to ascertain what the defendant was trying to say, *see U. S. v. Riggs*, 537 F.2d at 1222 (CA4, 1976), but in so doing he must be careful to remain neutral and neither denigrate the role of counsel nor himself assume the role of counsel.

The concept of "indecisiveness" referred to in *Miranda* relates, by its own terms, solely to an indecisive *request* for counsel. 384 U.S. at 485, 86 S.Ct. 1633, 16 L.Ed.2d at 730. This concept is not necessarily applicable to a situation in which the suspect (whether affirmatively or by simply making no request) first indicates willingness to proceed without counsel and then changes his position and requests counsel. An equivocal but unambiguous request for counsel, made pursuant to a change in position, is not the indecisiveness which the Supreme Court was addressing.

he first requested an attorney. "Equivocalness" created by continued interrogation after an unambiguous, unequivocal request for the presence of counsel cannot serve as the basis for an exception to the *Priest per se* rule.

Although this case has been before three courts before it reached us,[8] at no stage has any court hesitated in finding that Nash in fact requested counsel. No court has suggested that Nash's desire for an attorney was equivocal. Indeed, the district court specifically found Nash's request was "unequivocal."

Files' testimony before the state trial court, a crucial piece of evidence not even mentioned in the majority opinion, shows the lack of substance to the artificial construct put together by the en banc court.

Q Did you have trouble understanding him?

A No, did not.

. . . . .

Q Do you recall a discussion about him wanting an attorney?

A Yes.

Q *Did he ask for one?*

A Perhaps the tape would be the best evidence whether he was asking—*yes, he did.* He inquired what he should do to indicate that he wanted an attorney, *then he indicated that he did not want to have an attorney and went ahead.*

Q So he changed his mind; is that right?

A Rather than wait for the Court to appoint some one, to be his attorney, he went ahead and visited with me at that time.

Q *Then he apparently changed his mind?*

A *He appeared to have changed his mind.* He wasn't threatened, he wasn't promised, no one else took him off and visited with him and brought

him back. *He just appeared to have changed his mind.*

(Emphasis added.)

As this testimony shows, Files had no doubt that Nash wanted an attorney; Nash simply changed his mind [after further interrogation] and decided to go ahead without waiting for the court to appoint a lawyer. Files himself understood that Nash's request was for the presence of an attorney "here and now," because Files' immediate response to Nash's request was that the questioning would have to stop. *See Maglio v. Jago,* 580 F.2d 202, 205 (CA6, 1978). Thus, it is abundantly clear that "equivocation," if any, arose later as the product of continued questioning.

### B. Whether Files' questioning was limited to clarification

Even if continued questioning after Nash's request for counsel were somehow justified, that engaged in here was not permissible. Before and after the alleged "equivocation" sprang up, the continued questioning was not limited to clarification.

It is clear that any attempt by an interrogator to persuade the suspect to retract a previously-voiced request for counsel would require exclusion of the evidence. *See U. S. v. Massey,* 550 F.2d 300, 308 (CA5, 1978) ("Once the privilege has been asserted . . ., an interrogator must not be permitted to seek its retraction, total or otherwise."), *quoting U. S. v. Crisp,* 435 F.2d 354, 357 (CA7, 1970); *U. S. v. Clark,* 499 F.2d 802, 807 (CA4, 1974). Attempts by interrogators to persuade the suspect that he does not need an attorney present are nothing more than attempts to get the suspect to accept the untruth that the interrogators are "acting solely in [the suspect's] best interest." *Miranda,* 384 U.S. at 470, 86 S.Ct. 1625, 16 L.Ed.2d at 721. Such efforts were condemned in *Miranda*[9] and clearly would render any purported waiver invalid.

---

8. The Texas trial court, the Texas Court of Criminal Appeals, and the U. S. District Court for the Eastern District of Texas.

9. The underpinning of *Miranda* is the essentially coercive nature of in-custody interrogation.

Files did not limit himself to clarification but instead continued the interview with the purpose of removing the constitutional roadblock to obtaining an incriminating statement. Files' statements are inconsistent with an intent to merely "clarify" Nash's "true desires." The critical part of the interrogation, quoted above, occurred while Nash and the prosecutor were discussing whether Nash would sign the waiver form. Nash asked:

> If I want a lawyer present, I just put down here [on the waiver form] I want him present?

If Files had been interested solely in clarifying Nash's true intent, the only correct and fair answer to this query would have been "Yes." But a written demand for counsel would surely require terminating the interview. Thus the question did not produce an answer from the prosecutor but an evasion:

> Please just tell us about it. Any time we are talking and you decide that you need somebody else here, you just tell me about it and we will get somebody up here.

This response embraced several things: Nash should tell about the crime without the benefit of counsel; he should keep talking, and if and when he wanted a lawyer then he should make an oral request, although the form, the execution of which was the subject of discussion, provided for a written demand for counsel; he should

postpone until later the decision whether to have counsel.

After this ploy failed and Nash nevertheless requested an attorney, Files then expressed displeasure with Nash's decision and strongly intimated that the decision was not in Nash's best interests. Some of the bait dangled before Nash *after* he requested counsel was: "I had hoped we might talk about this", and "if you want a lawyer, I am going to have to hold off. It's your life." It is implied in these statements that the bar to questioning created by the request for counsel was disadvantageous to Nash, would prevent his ever "talking about the case," would delay matters, and put his future and even his life at risk. The right to counsel was eroded from an asset to a liability, and by the official voice against which *Miranda*-guaranteed counsel protects. This is not "clarification," and the court nowhere explains how it reached the implicit conclusion that what Files did was merely "to clarify the course the suspect elects to choose."[10]

### C. The equivocalness exception

Of course, whether Nash was equivocal in his desire for counsel and whether Files limited himself to "clarifying" are questions that need not be reached unless the majority's creation of the new "equivocalness" exception to the *Priest per se* rule is accepted. Under this exception, if a suspect makes inconsistent statements about

In discussing the facets of inherent coercion, the opinion of the Court discussed interrogation techniques as revealed by its examination of the "most enlightened" of police manuals. 384 U.S. at 447–455, 86 S.Ct. 1613–17, 16 L.Ed.2d at 709–13. One of these techniques concerned how to handle the suspect who asks for an attorney. The manuals recommended that the interrogator gain the suspect's confidence by recognizing his right to remain silent but that the interrogator thereafter point out the incriminating significance of the suspect's refusal to talk. The recommendations also included suggesting to the suspect that he save himself and his family the expense of an attorney and telling the suspect that he can handle the matter himself.

**10.** Our analysis of Files' statements is identical to that of the Sixth Circuit in a recent case

presenting remarkably similar facts. In *Maglio v. Jago*, 580 F.2d 202 (CA6, 1978), there was an equivocal request for an attorney, which the interrogating officer understood to be a request for the presence of an attorney. The interrogator then responded in almost exactly the same way as Files. He stated that the questioning would have to stop, implied that this was disadvantageous to the suspect, and suggested that the right to an attorney be waived. A confession was subsequently obtained. *Id.* at 203 n.1. The court concluded that "[t]he only plausible object of [the interrogator's] continued questioning was to break down the suspect's attempt to assert his rights and elicit a confession." *Id.* at 205. Files' goal was clearly the same, not clarification but obtaining a waiver of rights and a confession.

whether he wishes to avail himself of his right to the presence of counsel in such proximity to one another as to create uncertainty in the interrogator's mind about what the suspect really wants to do, then the interrogator may "make further inquiry to clarify the suspect's wishes."

I have serious reservations whether, despite its surface attractiveness, we should extend the permissible scope of questioning to include not only questioning for the purpose of resolving an ambiguity but also to include questioning where the suspect has made statements unambiguous within themselves but inconsistent with each other. My reservations about creating an "equivocalness" exception rests partly on the risk that officers will seek to find, or even to create, equivocalness where there is none and in so doing force the suspect constantly to reassert his right to counsel.[11] *See U. S. v. Rodriguez-Gastelum*, 569 F.2d 482, 489 (CA9) (en banc) (Goodwin, J., concurring), *cert. denied*, 436 U.S. 919, 99 S.Ct. 2266, 56 L.Ed.2d 760 (1978). Since the interrogator must decide for himself whether the suspect's "true desire" is reflected in his unambiguous request for counsel, there is a temptation for the interrogator to find equivocation in situations where there is none. Allowing the interrogator to decide whether the suspect "really means what he says" subtly shifts from accused to interrogator control of the decision whether to invoke the right to counsel. It induces the investigator to postpone supplying counsel after it is requested, in hope that in the interim the suspect will make some statement inconsistent with the request—opening up inquiry that will reveal (or produce) waiver of the right previously asserted.

In addition, equivocalness will seduce courts—and this case is a good example. After all, Nash, in a discussion of whether

he wanted a lawyer present here and now (*i. e.*, "we will get somebody up here"),[12] said he wanted a lawyer appointed. This rather simple dialogue has been transmuted into a conclusion that Nash's real desire was to be certain he could have counsel at trial.

Moreover the equivocalness exception is not susceptible of clear definition and hence cannot provide certainty for police and prosecutors. It forces both police and court to embark on the slippery path of analyzing what the suspect has said and done in the light of his mental capacities. And it requires the court to probe into the interrogator's statements and motives. A rule requiring interrogation to cease whenever there is a clear request for counsel, even though the suspect may make statements inconsistent with that request and the interrogator may harbor doubts about whether the statement reflects the suspect's true desires, provides a logical and easily perceived stopping point. With this bright line rule, the work of criminal investigation and of the trial and appeal of cases is not freighted with the difficulties, uncertainties and delays engendered by cases like this one.

To sum up, the majority's reliance on the equivocalness exception cannot be justified in this case, first, because the exception itself—at least as defined by the majority—is of dubious wisdom; second, because there was no equivocalness in Files' mind about whether Nash wanted counsel; and third, because Files' questioning after the request for counsel was not limited to clarification of Nash's wishes but instead was designed to obtain a waiver and confession from Nash. It is clear that the *per se* rule attached on Nash's initial requests for counsel and that interrogation was required to cease at that point. It did not cease,[13] and

---

11. Forcing a suspect to continually reiterate his request for counsel frequently has a coercive effect in that it may give the suspect the impression that his request for counsel will not be honored by his interrogator—even though the *Miranda* warning is designed to "show the individual that his interrogators are prepared to recognize his privilege should he choose to exercise it." 384 U.S. at 468, 86 S.Ct. at 1625, 16

L.Ed.2d at 720. *See, e. g., U. S. v. Womack*, 542 F.2d 1047 (CA9, 1976).

12. As already noted, Files understood that the discussion was about "here and now."

13. There may be post-request conversation so neutral in subject matter and unrelated to the development of evidence to be used against the

the confession that was the product of that interrogation must be suppressed.

## III. Waiver

An uncounselled confession may not be introduced into evidence against a criminal defendant unless the government can sustain its "heavy burden" of proving that the defendant has waived his right against self-incrimination and his concomitant right to the presence of counsel and that his waiver was "voluntary, knowing and intelligent." *Miranda v. Arizona*, 384 U.S. at 444, 475, 86 S.Ct. at 1612, 1628, 16 L.Ed.2d at 707, 724 (1966). This rule, derived from *Miranda* and *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), has not been eroded since those decisions and has been repeatedly reaffirmed by both the Supreme Court and this court. For example, in *North Carolina v. Butler*, —— U.S. ——, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979), the Court, in discussing when confessions may be used against a criminal defendant without violating his Fifth Amendment right against self-incrimination stated, "The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case. . . . The courts must presume that a defendant did not waive his rights; the prosecution's burden is great . . . ." *Cf. Brewer v. Williams*, 430 U.S. 387, 403, 97 S.Ct. 1232, 1241, 51 L.Ed.2d 424, 439 (1977) (discussing waiver of Sixth Amendment right to counsel; " 'The prosecution . . . has the weighty obligation to show that the waiver was knowingly and intelligently made.' "), *quoting Williams v. Brewer*, 509 F.2d 227, 233 (CA8, 1975). We have also had several occasions recently to state our adherence to this standard. *See, e. g., U. S. v. Hernandez*, 574 F.2d 1362, 1371 (CA5, 1978) ("heavy burden" on government to prove waiver; court should "indulge in every reasonable presumption against waiver"); *U. S. v. Brown*, 569 F.2d 236, 238 (CA5, 1978) (en banc) (government bears burden of proving effective waiver); *Government of Canal Zone v. Gomez*, 566 F.2d 1289, 1292 (CA5, 1978) ("cannot be too strongly emphasized that the prosecution still carries a heavy burden to prove a knowing and intelligent waiver"); *U. S. v. Massey*, 550 F.2d 300, 308 (CA5, 1977). The other circuits uniformly agree. *See, e. g., U. S. v. Dorsey*, 192 U.S.App.D.C. 313, 324, 591 F.2d 922, 933 (1978); *U. S. v. Harrigan*, 586 F.2d 860, 864–65 (CA1, 1978); *Maglio v. Jago*, 580 F.2d 202, 205 (CA6, 1978); *U. S. v. DiGiacomo*, 579 F.2d 1211, 1215 (CA10, 1978); *Pierce v. Cardwell*, 572 F.2d 1339 (CA9, 1978); *White v. Finkbeiner*, 570 F.2d 194, 201–02 (CA7, 1978); *U. S. v. Charlton*, 565 F.2d 86, 91 (CA6, 1977), *cert. denied*, 434 U.S. 1070, 98 S.Ct. 1253, 55 L.Ed. 2d 773 (1978); *U. S. v. Wyatt*, 561 F.2d 1388, 1390 (CA4, 1977); *U. S. v. Johnson*, 529 F.2d 581, 584 (CA8), *cert. denied*, 426 U.S. 909, 96 S.Ct. 2233, 48 L.Ed.2d 835 (1976). The government bears this heavy burden of proving waiver regardless of whether the suspect makes a request for counsel.[14] It is also settled that the govern-

suspect that it does not amount to continued "interrogation." *See, e. g., U. S. v. Grant*, 549 F.2d 942 (CA4, 1977), *vacated on other grounds*, 435 U.S. 912, 98 S.Ct. 1463, 55 L.Ed.2d 502 (1978); *U. S. v. Menichino*, 497 F.2d 935, 941 (CA5, 1971); *Farley v. U. S.*, 381 F.2d 357 (CA5, 1967). However, asking questions or making statements designed to elicit a waiver of rights and a subsequent confession clearly constitutes continued interrogation. *See Brewer v. Williams*, 430 U.S. 387, 399–400, 97 S.Ct. 1232, 1239–1240, 51 L.Ed.2d 424, 436–37 (1977); *Maglio v. Jago*, 580 F.2d 202, 205 (CA6, 1978); *U. S. v. McCain*, 556 F.2d 253 (CA5, 1977); *U. S. v. Massey*, 550 F.2d 300, 308 (CA5, 1977); *U. S. v. Clark*, 499 F.2d 802, 807 (CA4, 1974); *U. S. v. Crisp*, 435 F.2d 354, 357

(CA7, 1970). It is, of course, irrelevant whether the attempt to elicit a waiver and incriminating information is done through use of declarative or interrogatory sentences. *See U. S. v. Jordan*, 557 F.2d 1081, 1085 (CA5, 1977).

**14.** *See North Carolina v. Butler*, —— U.S. ——, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *Miranda v. Arizona*, 384 U.S. at 470, 86 S.Ct. at 1626, 16 L.Ed.2d at 721 ("An individual need not make a preinterrogation request for a lawyer. While such a request affirmatively secures his right to have one, his failure to ask for a lawyer does not constitute a waiver."); *Brewer v. Williams*, 430 U.S. at 404, 97 S.Ct. at 1242, 51 L.Ed.2d at 439 ("the right to counsel does not depend upon a request by the defendant"); *U. S. v.*

ment cannot in all cases conclusively meet its heavy burden of proving a valid waiver simply by producing a signed waiver of *Miranda* rights. As the Supreme Court said in *North Carolina v. Butler*, —— U.S. ——, ——, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979):

> An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case.[15]

The court at least pays lip service to this overwhelming array of precedent and yields that the confession may be used against Nash only if his waiver of his rights was made voluntarily, knowingly and intelligently. The court also concedes that courts should indulge in every reasonable presumption against effective waivers of rights. Yet at no point does the court discuss whether the government has carried its burden of proving that Nash's waiver of his rights was made knowingly, intelligently and voluntarily. Instead the court engages in a detailed discussion of district attorney Files' actions and motivations during the interview. Nevertheless, the court concludes that an effective waiver has been made and reverses the district court's grant of the writ without the remand for further fact-finding with respect to waiver that the panel thought necessary. *See* 560 F.2d at 658.

It is clear that the state has not carried its heavy burden of proving that Nash's waiver was voluntary, knowing and intelli-

gent. In cases in which there is no evidence showing that the waiver was the result of coercive statements by the interrogator and no evidence showing that the waiver was the product of confusion on the suspect's part, and there is evidence affirmatively showing that the suspect was sufficiently intelligent and well-educated to have fully understood his rights, the government sometimes may be able to satisfy its heavy burden of proving effective waiver simply by producing a signed waiver. *See, e. g., U. S. v. Brown*, 569 F.2d 236 (CA5, 1978) (en banc); *U. S. v. Wyatt*, 561 F.2d 1388 (CA4, 1977); *U. S. v. Springer*, 460 F.2d 1344, 1349 (CA7, 1972); *cf. U. S. v. Hopkins*, 433 F.2d 1041, 1044 (CA5, 1970) (waiver held knowing and intelligent in part because there was no "evidence that [the suspect] manifested inconsistent conduct because of confusion"). However, no case has been found in which it is suggested that the government can meet its burden of proving a valid waiver simply by producing the signed slip of paper purporting to be the defendant's waiver of his rights where there is evidence in the record showing the possibility that the waiver was not in fact voluntary, knowing or intelligent. There is an abundance of such evidence here. The existence of this evidence plainly calls for a more searching examination of the waiver question than that given in the court's opinion.

First, there is evidence in the record that Nash is not a person of normal intelligence (psychiatric testimony that he is "borderline mentally retarded"), that he did not graduate from high school, and that a psychiatrist found that Nash "was likely to be highly suggestible especially when dealing with an authority figure." Courts have uniformly

---

*Hernandez*, 574 F.2d 1362 (CA5, 1978). Any implication in *Government of Canal Zone v. Gomez*, 566 F.2d 1289 (CA5, 1978), that the government's heavy burden of proving a knowing, intelligent and voluntary waiver attaches only upon an express request for an attorney is inconsistent with the above cited cases.

**15.** *Accord Government of Canal Zone v. Gomez*, 566 F.2d 1289, 1292 n.7 (CA5, 1978) ("It goes without saying that a valid waiver will not be presumed simply from the fact that . . . .

the *Miranda* warnings were again given and purportedly understood by the accused prior to the confession."); *U. S. v. Massey*, 550 F.2d 300, 307–08 (CA5, 1977) ("valid waiver will not be presumed simply from the fact that . . . a waiver was eventually signed"); *Taylor v. Cardwell*, 579 F.2d 1380, 1383 n.2 (CA9, 1978) (*Miranda* "does not establish an irrebuttable presumption that all statements that comply with its rules are voluntary").

found that facts such as these to be relevant to whether the suspect was, during the interrogation, capable of fully understanding his rights and of intelligently and knowingly evaluating whether to waive them. For example, in *U. S. v. Brown*, 569 F.2d 236 (CA5, 1978) (en banc), in which this court found an effective waiver, the court relied on the fact that the suspect was a "well-educated teacher" in evaluating the validity of the waiver. Similarly, the psychological makeup of the defendant has been held relevant to whether he could in fact make an intelligent evaluation of the waiver. *See, e. g., Pierce v. Cardwell*, 572 F.2d 1339, 1343 (CA9, 1978) (suspect's "mental and physical state . . . a critical factor in the waiver determination"); *U. S. v. Brown*, 557 F.2d 541, 548 (CA6, 1977).

Second, that a suspect first requested the presence of counsel and then in short order changed his mind has been held by many courts to suggest confusion on the part of the suspect regarding his constitutional rights and whether he should waive them. *See e. g., U. S. v. Harrigan*, 586 F.2d 860, 865 (CA1, 1978) (where there was evidence of inconsistent statements by the suspect with regard to waiver, it is error for district court to find effective waiver without giving defendant opportunity to explore in detail the circumstances surrounding the waiver); *Maglio v. Jago*, 580 F.2d 202, 206 (CA6, 1978) ("A request for counsel followed quickly by a waiver suggests confusion at best, especially when accompanied by potentially confusing warnings"); *U. S. v. Hopkins*, 433 F.2d 1041, 1045 (CA5, 1970); *U. S. v. Nielsen*, 392 F.2d 849, 856 (CA7, 1968) (where suspect changes from a request for an attorney to a waiver of right, in the absence of evidence to contrary it is presumed waiver was not knowing and intelligent but instead was "product of ignorance and confusion"); *see also* Judge Mor-

gan's dissent from the panel opinion in this case, 560 F.2d at 660. Here, as in these cases, Nash's rapid change of position suggests confusion. Furthermore, it appears likely from a reading of the transcript that Nash gleaned from Files' remarks the idea that if he asked for an attorney, Files would *never* talk to him—that he was faced with a choice between talking to Files without an attorney and never talking to Files at all.[16]

Third, the transcript itself shows that Nash's change of position may have been at least in part the product of coercion implicit in Files' statements. After Nash requested counsel, Files made statements that Nash may well have construed as displeasure and disapproval. These statements may also have been construed by Nash as a statement that he would be placing himself at a disadvantage if he requested a lawyer:

> FILES: Okay. I had hoped that we might talk about this, but if you want a lawyer appointed, then we are going to have to stop right now.

> .    .    .    .    .

> FILES: Well, I can talk about it with you and I would like to, but if you want a lawyer, well, I am going to have to hold off, I can't talk to you. It's your life.

Indeed this is the construction I would place on this statement if I were in Nash's position. There is a strong possibility that Nash's waiver was not voluntary but was the product of psychological coercion brought to bear by Files' statements (regardless of what Files' intent was). *See* 560 F.2d at 660 (Morgan, J., dissenting).

Fourth, the record suggests the possibility that the confession Nash made during the interrogation was the product of previous incriminating statements made during

---

**16.** Files told Nash, "if you want a lawyer, well, I am going to have to hold off, I can't talk to you. It's your life." Although this statement arguably may be susceptible of being construed as meaning no more than that if Nash wanted a lawyer, the interrogation would only have to be temporarily delayed, Nash does not appear to have understood it in this way. He responded

in a manner suggesting that he thought he was faced with the decision between talking without a lawyer and not talking at all: "I would like to have a lawyer, but I'd rather talk to you." Files' reply could only have reinforced this impression in Nash's mind: "But if you want to have a lawyer here, well, I am not going to talk to you about it."

interrogations the circumstances of which, as outlined by the district court, strongly suggest the possibility of coercion. (The state did not attempt to introduce these incriminating statements at trial.) Nash may have felt that since he had already incriminated himself, he had "let the cat out of the bag" and had nothing to lose by reiterating his confession. If this was the case, his subsequent confession should be excluded as the product of the earlier interrogations, if these were coercive. *See, e. g., U. S. v. Bayer*, 331 U.S. 532, 540–41, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947); *Maglio v. Jago*, 580 F.2d 202, 207 (CA6, 1978).[17]

In sum, there is evidence tending to show Nash's sub-normal intelligence and education, a highly suggestible state of mind during the interview, confusion on Nash's part about his constitutional rights, the possibility that Files' disapproval of his request for counsel triggered Nash's waiver of his rights, and the possibility that Nash's confession was the fruit of prior coercive interrogations—evidence strongly probative of lack of knowledge, intelligence and voluntariness. Thus there is a strong possibility that the government will not be able to carry[18] its heavy burden[19] of proving that Nash's act of signing the waiver form was done knowingly, intelligently and voluntarily.[20]

At any rate, the majority errs when it denies the writ without there having been an evidentiary hearing at which Nash is given the opportunity to develop facts

17. The majority notes that Files was aware of Nash's previous confessions. The court suggests that Files was "surprised" when Nash asked for a lawyer because the previous confessions had created an "expectation that Nash would repeat his confession." Certainly the court, in assessing Files' actions and motivations, cannot rely on any "expectation" arising from prior confessions where there has been no showing of voluntariness in making the prior confessions, and the record suggests possible coercion.

18. Judge Morgan strongly argued in his dissent to the panel opinion that it would be impossible for the government to carry its burden on these facts. *See* 560 F.2d at 660.

19. There is some dispute over the exact content of the government's heavy burden. Some have argued that the government's burden is less stringent in Fifth Amendment self-incrimination cases than in Sixth Amendment right to counsel cases, such as *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). *See, e. g., North Carolina v. Butler*, —— U.S. ——, ——, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979) (Blackmun, J., concurring); *U. S. v. Brown*, 569 F.2d 236, 239 (CA5, 1978) (en banc) (Hill, J., concurring); *U. S. v. Satterfield*, 558 F.2d 655 (CA2, 1976). Whether the government's "heavy burden" is heavier in Sixth Amendment cases than in Fifth Amendment cases is an issue that need not be addressed on this appeal since under any burden of proof, even a preponderance of the evidence standard, the government is unlikely to prevail. If this case were remanded to the district court (as I think it should be if the *per se* rule is held inapplicable) and the district court found the outcome hinged on the precise content of the burden of proof, it could then ascertain the correct resolution of this issue. It may also be

that the petitioner's Sixth Amendment right to counsel had attached at the time of the interrogation in question. A suspect's Sixth Amendment right to counsel attaches at the time that "adversary judicial proceedings have been initiated against him." *Kirby v. Illinois*, 406 U.S. 682, 688, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411, 417 (1972). Before Files' interrogation of Nash, Nash had been taken before a magistrate pursuant to Tex.Crim.Proc.Code Ann. art. 15.17 (Vernon) where he was given a printed form stating what offense he was "charged with." *Wyatt v. State*, 566 S.W.2d 597, 600 (Tex.Cr. App.1978), holds that this hearing before a magistrate is not the beginning of adversary judicial hearings for Sixth Amendment purposes, but the district court is of course free to reexamine this question of federal constitutional law.

20. Although the state trial court conclusorily held Nash's waiver to be voluntarily, intelligently and knowingly made, this finding is not binding on the federal district court because the question of waiver is not one of historical fact, on which 28 U.S.C. § 2254(d) requires federal courts to defer to state findings of fact, but instead is a question that requires the application of federal constitutional law to the underlying historical facts. *See Brewer v. Williams*, 430 U.S. at 403–04, 97 S.Ct. at 1241–42, 51 L.Ed.2d at 439. Thus the federal district court is required to reexamine the state trial court's finding of waiver. *Id.* at 402, 97 S.Ct. at 1241, 51 L.Ed.2d at 438. The trial court did not explain the reasoning underlying its finding of effective waiver and merely noted that it did not overlook the fact that Nash is sub-normal in intelligence. It did not make subsidiary findings of historical fact.

showing lack of an effective waiver. *See Pierce v. Cardwell*, 572 F.2d 1339, 1342–43 (CA9, 1978). The transcript of the interrogation, which is the sole basis for the majority's findings of fact, does not contain sufficient information from which it can be ascertained that Nash was not confused or was not coerced into waiving his rights.

Finally, let us examine the court's treatment of the waiver issue. The court correctly states the controlling burden of proof but then concludes that the "critical factor" in determining whether there has been an effective waiver is whether "the interviewing agent has impinged on the exercise of the suspect's continuing option to cut off the interview." As the preceding discussion of waiver precedents should demonstrate, the proper resolution of the question of the effectiveness of a waiver cannot be reduced to the single issue—the presence or absence of official trickery that has the effect of forestalling a desire for counsel—that the majority finds to be dispositive. Instead the court's inquiry must necessarily focus on the state of mind of the accused at the time the waiver was made, *cf. U. S. v. Brown*, 557 F.2d 541, 546 (CA6, 1977) (voluntariness of confession determined by examination of suspect's state of mind), and this inquiry must comprehend all the factors that had an impact on the suspect's decision. It cannot logically be limited to the presence or absence of official deceptiveness or coercion. Contrary to the majority's implication, a finding that the interrogator was a "devious trickster" is not a *sine qua non* for a finding of lack of effective waiver.[21]

The court in equating effective waiver with the absence of official action impinging on the exercise of the suspect's constitutional rights appears to rely on language from *Michigan v. Mosley*, 423 U.S. 96, 103, 96 S.Ct. 321, 326, 46 L.Ed.2d 313, 321 (1975). This language is inapplicable to the question of valid waiver. The *Mosley* Court was discussing only whether a *Miranda*-derived *per se* rule against further interrogation is appropriate when a suspect states his intention to remain silent. The Court directed its attention only to the *per se* rule. The validity of the waiver obtained in *Mosley* was not an issue before the Court, and no part of its opinion can fairly be read as modifying in any way previous caselaw regarding the government's burden of proving the validity of waivers. Indeed, the Supreme Court has since reaffirmed waiver law as it existed prior to *Mosley*.[22] *See North Carolina v. Butler, supra; cf. Brewer v. Williams, supra.*

Even accepting this erroneous standard for effective waiver—the absence of official trickery forestalling the suspect's desire for counsel—the majority errs in its application of it to the facts of this case. The court states two grounds for its conclusion that Files did not make statements designed to

---

**21.** A showing of a bad faith attempt by an interrogator to mislead the suspect or to coerce him into waiving the right to counsel arguably might result in the exclusion of any confession subsequently obtained without the need for an examination of the impact that the official impropriety had on the mind of the accused. Some have suggested that the exclusionary rule be applied to bad faith conduct simply because such official misconduct will not be tolerated. *See, e. g., Brewer v. Williams*, 430 U.S. at 406–09, 97 S.Ct. at 1243–44, 51 L.Ed.2d at 442–43 (Marshall, J., concurring); *U. S. v. Brown*, 551 F.2d 639, 650 (CA5, 1977) (Fay, J., dissenting), *on reh. en banc*, 569 F.2d 236 (CA5, 1978); *cf. U. S. v. Fredericks*, 586 F.2d 470, 481 (CA5, 1978), *cert. denied*, — U.S. —, 99 S.Ct. 1507, 59 L.Ed.2d 776 (1979) (gross misconduct by interrogator would render evidence unusable by government in any criminal proceeding).

**22.** *Mosley* established a two-tier approach to the use of inculpatory statements obtained after invocations of the right to silence. First, it is ascertained whether the suspect's right to cut off questioning was "scrupulously honored." If it was not, the *Miranda per se* rule against use of the statement applies and inquiry into the validity of waiver is not necessary. If the suspect's right was not scrupulously honored, then the court must proceed to an inquiry into whether the purported waiver was valid. This two-step procedure has since been followed in the lower courts. *See, e. g., U. S. v. Ford*, 563 F.2d 1366 (CA9, 1977), *cert. denied*, 434 U.S. 1021, 98 S.Ct. 747, 54 L.Ed.2d 769 (1978); *U. S. v. Finch*, 557 F.2d 1234 (CA8, 1977), *cert. denied*, 434 U.S. 927, 98 S.Ct. 409, 54 L.Ed.2d 285 (1978).

forestall Nash's desire for counsel. Neither is sufficient to support the conclusion.

First, the majority suggests that Nash did not in fact want an attorney to advise him. Thus, whatever Files said could not have had the effect of dissuading Nash from his nonexistent desire to have an attorney present. The court concludes, solely from a reading of the transcript of the interview, that Nash's "true desire [was] to explain himself and to continue with the interview." It is not possible to make a finding of fact with respect to what Nash really wanted when he requested counsel solely on the basis of the transcript of the interview.[23] Nash's testimony about what he wanted when he requested the appointment of an attorney is indispensable to any

decision about the state of Nash's mind at that point. The district court never made findings about Nash's state of mind and such findings, assuming *arguendo* these to be necessary, must be made by the district court after a full evidentiary hearing.

The second premise for the court's conclusion that Files did not forestall Nash's wish for counsel is its reliance on a presumption that all public officers discharge their duties "with regularity and in compliance with the Constitution." Despite the hundreds of cases that have reached the courts on custodial interrogation, right to counsel, and waiver of counsel, the opinion cites no case in which it has ever before been suggested that this administrative presumption has any application in such cases.

**23.** The court's opinion is somewhat confusing in this regard. Part IV seems to be devoted to a discussion of the propriety of Files' response to the inconsistency between Nash's oral request for an attorney and what the court perceives to be Nash's "true desire" to talk without an attorney. An appellate finding of fact with respect to Nash's "true desire" could not be inconsistent with the district court's findings of fact because the district court made no findings distinguishing between Nash's express desire and his "true desire." Yet the majority states that it rejects the district court finding that Nash "never requested an attorney's presence during questioning." It is puzzling that the majority finds such appellate factfinding necessary, since the reasoning of Part IV does not appear to depend in any way on this finding and since the court seems to accept in Part III and in all but the opening paragraph of Part IV that Nash's words, if read alone, convey a request for an attorney.

In any event, if this finding of fact is crucial to the majority's result, the en banc court should be dissolved. It seems to me singularly inappropriate for the court en banc, limited by rule to consideration of questions of "exceptional importance," F.R.A.P. 35, to decide a case upon a factual basis, derived from its reading a transcript in a manner different from the reading by the district court. Under the uniform practices of this court, the basis for decision in this case is not an en bancworthy issue. Cf. *U. S. v. Collins*, 462 F.2d 792, 802 (CA2, 1972) (en banc) (inappropriate to grant rehearing en banc merely to resolve a question of fact in a particular case). It is difficult to justify the en banc court's sitting as super factfinder in view of the stringent requirement we place upon counsel petitioning for rehearing en banc to certify to us that the case involves a

conflict in decisions of the circuit or an issue of "exceptional importance." Presumably, for the majority, sauce for the petitioning goose is not sauce for the decisional gander.

Moreover, as discussed earlier, any finding that Nash never requested the presence of counsel is not supportable. The majority's suggestion that Nash was only concerned with having a lawyer at some time in the future is simply not supported by the transcript. The entire dialogue concerned a lawyer present "here and now" until Files' third from the last question in which, faced by Nash's twice-voiced statement that he wanted a lawyer appointed, Files brought in for the first time that waiver of a lawyer "here and now" did not mean that Nash would not ever have a lawyer. Files' response to Nash's request and his testimony at the trial court suppression hearing reveal that he understood Nash to have requested the immediate presence of an attorney. The state courts that have previously considered this case and the federal district court have not even intimated that Nash never requested the presence of counsel and have discussed the case as presenting the question of the applicability of the *Priest per se* rule where the suspect has requested the right to have counsel present. *See Nash v. State*, 477 S.W.2d 557 (Tex.Cr.App.), *cert. denied*, 409 U.S. 887, 93 S.Ct. 191, 34 L.Ed.2d 144 (1972). The state also has not suggested at any time during these proceedings that Nash's initial request for appointment of an attorney was not in fact a request for the presence of an attorney during interrogation.

In light of the unsupportability of such a finding of fact and of my reading of the majority opinion as not resting on this finding, my textual discussion simply assumes that the majority made no such finding.

The presumption has two prongs.[24] First, the majority appears to employ "regularity" to establish that Files was acting in good faith and with proper intentions. Although, as discussed above, the bad faith of an interrogating officer arguably renders a confession inadmissible in all circumstances, *see* note 21 *supra*, the converse is not true. A showing of an official's good faith does not compel a finding that there has been no constitutional violation. *See U. S. v. McCain*, 556 F.2d 253, 256 (CA5, 1977) ("The fact that the inspector was acting out of concern for the defendant's well-being does not eliminate the requirements of *Miranda*."); *U. S. v. Bailey*, 468 F.2d 652, 660 (CA5, 1972) ("police overreaching, mental coercion, and actual or implied promises— regardless of the motive of the person eliciting the confession—may render the statement obtained involuntary"); *Frazier v. U. S.*, 136 U.S.App.D.C. 180, 187 n.31, 419 F.2d 1161, 1168 n.31 (1969) ("incriminating statements may be involuntary, and thus 'compelled' within the meaning of the Fifth Amendment, even where the police are not at fault"); *cf. Fielder v. Bosshard*, 590 F.2d 105, 109 (CA5, 1979) (§ 1983 suit; "official may violate due process and fourth amendment rights without necessarily acting in bad faith").

The test must be an objective one measured by the likelihood of impact upon the mind of the suspect. He cannot waive, abandon or fail to exercise his right to counsel by reason of the good intentions of the interrogator except to the extent that those intentions are objectively revealed.

Application of the second prong, a presumption that an officer exhibits to a suspect "objectively proper conduct," is no more justifiable. Nowhere in the body of law with which this case is concerned is there any suggestion that a suspect carries

the burden of overcoming this, or any other, presumption. The majority's casual creation of new standards is counter to the law of waiver of constitutional rights. The fact-finding process simply cannot be weighted against the defendant by a presumption that the interrogator's conduct would have appeared constitutionally proper[25] to an objective observer. *In fact, the rule is that the presumptions to be indulged in this fact-finding process are presumptions against the state.* See, e. g., Brewer v. Williams, 430 U.S. at 404, 97 S.Ct. at 1242, 51 L.Ed.2d at 440 ("courts indulge in every reasonable presumption against waiver"); *Government of Canal Zone v. Gomez*, 566 F.2d 1289, 1292 (CA5, 1978); *U. S. v. Wyatt*, 561 F.2d 1388, 1390 (CA4, 1977). The presumption *against* waiver is surely inconsistent with the majority's reliance on the administrative presumption of regularity. *See U. S. v. Dorsey*, 192 U.S.App.D.C. 313, 324, 591 F.2d 922, 933 (1978) ("The government holds the burden of proof on the waiver issue, and we indulge no presumptions in the government's favor in that endeavor."); *cf. Goodwin v. Smith*, 439 F.2d 1180, 1183 (CA5, 1971) (habeas petition alleging guilty plea made without counsel; "waiver question is not to be resolved against petitioner . . . by resort to a 'presumption in favor of validity' ").

Finally, it should be noted that even in its proper context the administrative presumption of regularity cannot be used as it is by the majority, to avoid a careful examination of the statements of Files in order to see if Nash's constitutional rights were violated. The Supreme Court has stated that even where reviewing actions of administrative officers the presumption of regularity "is not to shield [an administrative official's] action from a thorough, probing, in-depth

---

24. The majority may also be relying on the presumption as a means of rebutting a supposed district court reliance on a finding that there was an "insidious prosecutorial stratagem." If this is the majority's purpose, it is attempting the destruction of a straw man. The district court made no such finding; it only suggested, in dictum, that Files engaged in "what may well have been an insidious prosecutorial strat-

agem." Though the district court obviously was suspicious of Files' motives (understandably so in my view), it did not rely on a finding of insidious prosecutorial motivation and instead relied on the *Miranda-Priest per se* rule.

25. Presumably the majority means neither misleading nor coercive.

review." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136, 153 (1971). Surely no less probing a review is required where fundamental constitutional rights are at stake.

## IV.

The majority has done more than merely engraft a limited equivocalness exception to the *Miranda-Priest per se* rule. By its application of this exception to the facts of this case, in which the interrogator was not unsure whether the suspect desired the assistance of counsel but nevertheless persisted in attempts to obtain a waiver from the suspect, the court's opinion threatens to allow the equivocalness exception to swallow the *per se* rule. Equally disturbing, if not more so, is the majority's failure to consider all of the evidence that is relevant to whether Nash made a voluntary, knowing and intelligent waiver of his rights. Finally, the introduction of the administrative presumption of regularity into the law governing confessions is most disturbing of all, for, despite the majority's disclaimers, the use of this presumption turns the established law regarding waiver on its head, with the burden of proof effectively placed on the suspect rather than the government.

I concur with the court's *per se* rule, but I dissent from the refusal to apply it in this case.

ALVIN B. RUBIN, Circuit Judge, dissenting:

If I thought our efforts to decide this case were appropriate, I would adhere to Judge Godbold's splendid opinion. However, with all deference for the views of my twelve brethren who array themselves for or against the majority opinion, I would instead vacate the order granting rehearing en banc on the basis that the issues in the case do not warrant review by the entire court. *See* Judge Godbold's opinion, footnote 23. *Compare* the statement in the majority opinion at page 518, ("the outcome of Nash's habeas petition turns on a factual analysis of his interview with Files").

F.R.A.P. 35(a) permits en banc review for cases of "exceptional importance." Our manual, Internal Operating Procedures, Part V.C.5.a. states, "A petition for rehearing en banc is an extraordinary procedure which is intended to bring to the attention of the entire court a precedent-setting error of exceptional public importance or an opinion which directly conflicts with prior Supreme Court or Fifth Circuit precedent. Alleged errors in the determination of state law, or in the facts of the case (including sufficiency of the evidence), or error asserted in the misapplication of correct precedent to the facts of the case, are matters for *panel rehearing* but not for rehearing en banc." (Emphasis in original). The eleven typewritten pages of the majority opinion and the thirty pages of partial dissent do not deal with such issues. Whether or not we were in error in voting to hear the case en banc, we should not persist in this exercise, but should merely vacate the en banc order as improvidently entered.

All of us agree on application of the per se rule; we differ only on whether it was triggered here, and, even if not, whether Nash's waiver of counsel was "voluntary" as required by *Miranda*. The two opinions consist largely of variant interpretations placed on a conversation the words of which are recorded for all to read.

We can review en banc only about 1% of the 2200 decisions this court makes a year. Even to do this, we must devote to it an inordinate proportion of the total time we have for court sittings. Soon, with eleven more circuit judges, we will be rendering 3500 opinions annually. We ought to mobilize our en banc forces only to meet urgent legal necessity, not to belabor facts or to correct putatively errant panels. The light we shed here is not worth the thirteen-judge candle.