**UNITED STATES of America**

v.

**Cesar Sandino GRULLON and Virgilio Armando Mejia, Defendants.**

**Crim. No. 79–180.**

United States District Court,
E. D. Pennsylvania.

Oct. 15, 1979.

Roberto Rivera–Soto and W. Cecil Jones, Asst. U. S. Attys., Philadelphia, Pa., for the U. S.

Carmen Nasuti, Philadelphia, Pa., for defendant Grullon.

Elliot Goldberg, Phoenixville, Pa., for defendant Mejia.

## BENCH OPINION *

LOUIS H. POLLAK, District Judge.

Now to be ruled on are two motions to suppress inculpatory post–arrest statements of the movant defendants, Cesar Sandino Grullon and Virgilio Armando Mejia. These are statements which the Government intends to use as part of its case in chief against Grullon and Mejia at their upcoming trial.

Grullon and Mejia were indicted on July 31, 1979. The indictment charges them with participation in two conspiracies, one to export weapons to Nicaragua without a license, the other to import cocaine from Columbia.

Named in the same indictment, but charged only with participation in the first conspiracy, were Ramon Barrientos and Michaek Karasik. Pursuant to an order of

---

* With a view to meeting minimum standards of intelligibility, the Bench Opinion which was announced on October 15, 1979 has been very slightly edited, but only to the extent required (a) to eliminate typographical errors and gross deviations from grammatical norms, and (b) to break down sentences of confounding length and complexity into bite–size units.

October 5 and an explanatory opinion of October 9 granting the Government's motion to sever, Grullon and Mejia are to be tried together prior to a joint trial of Barrientos and Karasik.

All four defendants were arrested on July 24, a week before they were indicted, the arrest warrants supported by complaints issued in the late afternoon.

Barrientos and Karasik were arrested in Miami where they reside. With their arrests we have no present concern.

Grullon, a citizen of the Dominican Republic, who came to Philadelphia last November as Consul General, was arrested on returning to his home in Cherry Hill from an evening Berlitz class in beginning English. Mejia, a citizen of Honduras, resident in the United States since 1963, was arrested on arrival for the night shift at his work place in Philadelphia.

Upon arrest, Grullon and Mejia were each driven to the Customs House in downtown Philadelphia. Thereafter, their papers and the money on them were examined and inventoried in accordance with customary procedures and each of them was formally interviewed.

The interviews were conducted by federal agents—agents of the Customs Service assisted by agents of ATF and DEA—and by Roberto Rivera–Soto, Esquire, the Assistant United States Attorney who, together with Assistant United States Attorney Cecil Jones, is in charge of this prosecution.

As Grullon and Mejia were advised and as Mejia at least explicitly preferred, the interviews were tape recorded. The interview with Grullon, who was taken into custody at 9:24 p. m., commenced approximately an hour later at 10:25 p. m. and concluded at 12:15 a. m. on the morning of July 25.

The interview with Mejia, who was taken into custody at 10:55 p. m., also commenced approximately an hour after his arrest—to be precise, at 11:42 p. m.—and concluded at 12:59 a. m. on the morning of July 25.

These recorded interviews are the statements Grullon and Mejia have moved to suppress.

The authenticity of the tapes and of the transcriptions made from those tapes is not questioned. I say that noting that there was a minor correction with respect to the identity of one of the interlocutors on one of the tapes, which correction was made without objection and in no way affects any of the issues addressed in these motions.

Not making any claim as to lack of authenticity with respect to the tapes or the transcriptions made from those tapes, what Grullon and Mejia both deny is that the statements were elicited in conformity with the guarantees of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 the landmark decision of the Supreme Court in 1966. Specifically, each one asserts that the fact that he answered questions without a retained or appointed lawyer at his side was not the result of a waiver of his right to remain silent and/or his right to counsel, which waiver was "made voluntarily, knowingly and intelligently," as those words are used in *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612.

As the interviews of Grullon and Mejia were separate, so the factual contexts of the two motions are quite distinct. Many facts are common to both. Each man, for example, was apprised of and acknowledged understanding of his *Miranda* rights more than once. But the lengthy scenarios are very different over–all.

Thus, Mejia, fluent in English and not unfamiliar with the American arrest process, signed a form of waiver of his *Miranda* rights but thereafter took advantage of Agent O'Connor's invitation to call his retained attorney. Yet when his phone call did not go through because his attorney was not at home, Mejia responded at length and without apparent demurrer to the questions thereafter put to him.

By contrast, Grullon, who knows little English and nothing about the American criminal justice system, but is far better educated than Mejia, told his interlocutors through an interpreter that, "I want to talk to you," and added in the next breath that he would not sign the proffered waiver

form. "I don't feel up to signing it. I don't feel up to signing a paper without having a lawyer." Whereupon Grullon, who had already responded in an inculpatory way to a few preliminary questions, resumed and elaborated upon his responses.

■ Neither Mejia's signing of a waiver form nor Grullon's refusal to sign accompanied by an announced willingness to talk is of itself conclusive of the legal question posed by each motion to suppress.

■ As Mr. Justice Stewart recently noted for the Court in *North Carolina v. Butler*: "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." 441 U.S. 369, at 373, 99 S.Ct. 1755, at 1757, 60 L.Ed.2d 286. So a determination whether either Mejia or Grullon "in fact knowingly and voluntarily waived" his *Miranda* rights requires a detailed scrutiny of the course of each interview up to the point of substantial inculpation. In undertaking this scrutiny it is important to bear in mind that the Government has the burden of demonstrating waiver and, moreover, that, as Mr. Justice Stewart said for the Court in *Brewer v. Williams*: "courts indulge in every reasonable presumption against waiver," 430 U.S. 387 at page 404, 97 S.Ct. 1232, at page 1242, 51 L.Ed.2d 424.

With these general postulates in mind, I would then turn to an examination of the factual context of each of the two motions. Before turning to each, I would simply interpolate that a line of challenge much elaborated in the testimony taken which I have found in no way compelling and, therefore, am giving no attention to, is one which I will mention simply to explain my reason for not pursuing it. The line of challenge pursued by both defendants is that which suggests that the arrests in the cases of Messrs. Grullon and Mejia were both timed in such a way as to come as late in the day as possible with a view, so the presentation seemed designed to suggest, of making extremely unlikely any effective communication between Grullon or Mejia with counsel or anyone else who could be of assistance while in custody at the Customs House.

I simply would note that I find nothing fruitful in the suggestion that the federal agents in charge of the arrest of Mejia and Grullon were in any way avoiding their appropriate obligations to the two persons whom they were taking into custody. Indeed, I might go beyond that in saying that, as I read the transcripts of the tape recorded interviews and as I have listened to the testimony which has elaborated upon the interviews and the pre–interview processes, I find that I have no ground for criticism of the treatment which I believe was accorded Mejia and Grullon respectively by those agents and by the Assistant United States Attorney who interrogated each.

To the extent that what is said in the balance of my opinion suggests deficiencies with respect to the ultimate vindication of the *Miranda* rights of Grullon or Mejia, I want it clearly understood that these are not to be viewed as deficiencies which reflect on the good faith or the sense of professional responsibility of any of the persons involved.

First I turn to the setting surrounding the interrogation of defendant Mejia. As already noted, Mejia had signed a form waiving his *Miranda* rights before his interview began. Also before the interview, he advised Agent Frysiek that his lawyer was at the Philadelphia firm of Jiminez and Arzon, whose card was among the papers he had on his person when his belongings were inventoried on arrival at the Customs House. At the start of Mejia's interview, Assistant United States Attorney Rivera–Soto noted that Mejia had already been twice advised of his rights, had signed a waiver "and has expressed his willingness to give a statement. Before the statement will be given, I will, however, again advise Mr. Mejia of his rights and make sure that he is waiving these rights and advise him

that he also has the right to make a telephone call and that this conversation will be on tape."

Thereafter, Mejia acknowledged that he had signed the waiver form and said "yes, sir," when Mr. Rivera–Soto, having read aloud the *Miranda* rights appearing on the form above Mejia's signature, inquired, "Do you understand all these rights?"

Thereupon the following ensued–and at this point I must ask your indulgence for reading at some length some part of a colloquy–and it was Mr. Rivera–Soto who was questioning at this point:

"Q. Now, it says here, there's a checkmark that you have read this statement of your rights shown above and you understand what your rights are and you elect to waiver. You are willing to answer questions and make a statement, you do not want a lawyer. You understand and know what you are doing. No promises or threats have been made to you and no pressure of any kind has been used against you. You've been taken into custody at 10:55 p. m. on July 24, 1979, and you signed a document at 11:20 p. m. on July 24, 1979. Is that correct?

"A. Do you mind if you read again about the lawyer? What it say about the lawyer?

"Q. What about the lawyer? What exactly do you want to know?

"A. If I have a right to have my lawyer?

"Q. You have a right to have a lawyer present, here. If you cannot afford one, you will have one appointed for you, but that cannot be done until tomorrow morning. Understand that? All right, you have signed this form saying that you are willing to waive all those rights and to speak to us now.

"A. Yes..

"Q. Do you understand that?

"A. Yes.

"Q. Did you sign that form of your own free will?

"A. Yes, sure.

"Q. Are you still willing to make the statement?

"A. Yes, sir.

"Q. And are you willing to answer all the questions posed to you by these gentlemen?

"A. Yes, sir.

"Q. Okay, do you understand that if you–at some time you get to a question that you do not want to answer, you don't have to answer it?

"A. Yes.

"Q. Okay. Do you understand that you have the right to make a telephone call?

"A. Yes, sir.

"Q. Okay, and you can, we'll provide you with the phone?

"A. Yes, sir.

"Q. All right. Are you willing to answer these men's questions?

"A. Yes, sir.

"Q. Okay. Shall we commence then, as soon as–Agent Frysiek is here, we can commence the interview and I will be outside.

"A. Very well.

"Q. Okay?

"A. Very well.

"BY AGENT O'CONNOR:

"Q. Before we proceed, Armando, why don't you sit in this chair here–

"A. Sure.

"Q. –

"A. Okay now?

"AGENT FRYSIEK: Okay, fine.

"AGENT O'CONNOR: Armando, do you want to call your attorney right now?

"MR. MEJIA: If it's possible.

"AGENT FRYSIEK: Okay, what we can do is, we'll stop the tape right now, okay, after you've completed your telephone call, we'll start it again. I'm gonna stop the tape right now, it is 11:47 and 20 seconds.

"Okay, it is exactly 11:53 and 12 seconds. Mr. Mejia has attempted to contact his attorney but was unsuccessful. He has agreed to speak with us pending contact by his attorney sometime later this evening.

"Mr. Mejia, we'll like for you to give us in your own words now the circumstances surrounding the incidents which have transpired to this date which led up to your arrest. We are going to stop you during the course of your testimony and ask you certain questions. We'd appreciate it if we could proceed now."

Whereupon, for approximately an hour, Mejia responded to the questions by Agent Frysiek and others about the circumstances leading up to Mejia's arrest.

Between 11:47 and 11:53 p. m., that is, the interval during which the tape recorder was turned off, Mejia telephoned his attorney, Rudy Arzon, Esquire, at his home. Mr. Arzon was not there. Mejia asked Mrs. Arzon to ask her husband on his return to telephone Mejia at the number from which Mejia was calling. The question is whether, on this record, Mejia can be said to have "voluntarily, knowingly and intelligently" waived his rights to have his attorney with him during the portion of the interview which began at 11:53 p. m. after Mejia spoke by phone to Mrs. Arzon.

Prior to the phone call Mejia had been apprised of his *Miranda* rights at least three times and his signature on the waiver form is certainly substantial evidence that before the interview began he felt he understood his rights and decided not to stand on them.

But as the colloquy I have just read discloses, Mr. Rivera–Soto's further exposition of the *Miranda* rights after the interview had begun triggered Mejia's concerns about his entitlement to counsel:

"Q. Do you mind if you read again about the lawyer? What does it say about the lawyer?

"A. What about the lawyer? What exactly do you want to know?

"Q. If I have a right to have my lawyer.

"A. You have a right to have a lawyer present, here. If you cannot afford one, you will have one appointed for you, but that cannot be done until tomorrow morning."

Mejia, of course, did not have to have a lawyer appointed for him since Mr. Arzon represented him. Apparently realizing this, Agent O'Connor provided Mejia with an opportunity to telephone Mr. Arzon before the substantive interrogation began. When Mr. Arzon could not be reached, Agent Frysiek announced that the interview would proceed, Mejia having, in Agent Frysiek's words, "agreed to speak with us pending contact by his attorney sometime later this evening."

The question whether, after a person in custody asks for a lawyer, interrogation can continue at all and, if so, under what circumstances, has generated a substantial quantity of case law. Under the aegis of *United States v. Priest,* 409 F.2d 491, the Fifth Circuit early developed what appeared to be a *per se* prohibition on further interrogation until the person in custody was given and had exercised an opportunity to consult with a lawyer:

. . . the suspect has an absolute right to delay interrogation by requesting counsel. If such a request is disregarded and the questioning proceeds, any statement taken thereafter cannot be a result of waiver but must be presumed a product of compulsion, subtle or otherwise.

That was *Priest,* 409 F.2d at 493. The Ninth Circuit, on the other hand, declined to adopt a *per se* rule or even to accept the view that interrogation could resume without counsel only if the waiver of counsel were "initiated by the suspect." That was in the *United States v. Rodriguez–Gastelum* case, 569 F.2d 482, at page 489, the quotation being from the concurring and dissenting opinion of Judge Goodwin.

The position that the Ninth Circuit there rejected–which would have, in effect, said that resumption of interrogation after a request for counsel could only come about if the suspect initiated the resumption of interrogation and thereby the waiver of counsel–was a position which the Fourth Circuit had suggested some authority for. See *United States v. Clark,* 499 F.2d 802.

The Supreme Court has not ruled on the question. Given the antipathy to *per se*

rules reflected in *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (where the Court held that invocation of the right to silence does not foreclose further interrogation several hours later about another crime) and also in *North Carolina v. Butler* (in which the Court very recently held that an express disclaimer of a wish to exercise *Miranda* rights was not essential to accomplish an effective waiver), it might reasonably be supposed that the *Priest* approach, foreclosing by means of a *per se* rule any waiver of counsel once the right has been invoked, would not be an approach that would commend itself to the Supreme Court. Nonetheless, the language of Mr. Justice White, concurring in *Michigan v. Mosley*, suggests that there are good reasons for taking a more jaundiced view of the latter situation—i. e., waiver of counsel after the right to counsel has been invoked—than of such other waivers as waiving the right to silence after one may have invoked that.

This is what Mr. Justice White said in a footnote in the *Mosley* case, the *Mosley* case being one in which, as Mr. Justice White was at pains to point out, the problem before the Court was not one of an asserted waiver of a previously asserted right to counsel: "The question of the proper procedure following an expression by an individual of his desire to consult counsel is not presented in this case. It is sufficient to note that the reasons to keep the lines of communication between the authorities and the accused open when the accused has chosen to make his own decisions are not present when he indicates instead that he wishes legal advice with respect thereto. The authorities may then communicate with him through an attorney. More to the point, the accused having expressed his own view that he is not competent to deal with the authorities without legal advice, a later decision at the authorities' insistence to make a statement without counsel's presence may properly be viewed with skepticism." 423 U.S. at 110 n. 2, 96 S.Ct. at 329 n. 2. (concurring opinion).

The Fifth Circuit has very recently qualified its *Priest* rule, limiting itself to the situation in which "prior to any questioning, the suspect makes an unequivocal request for an attorney's presence, as was done in *Priest*, and when the request is disregarded, and the questioning proceeds." This is the language of the Fifth Circuit in *Nash v. Estelle*, 597 F.2d 513, 517, decided this spring. When the request for an attorney is equivocal, the Fifth Circuit has concluded that "it is sound and fully constitutional police practice to clarify the course the suspect elects to choose." That quotation is also from page 517.

In the present case it is Mejia's position that his phone call to his lawyer was intended to bring him to Mejia's side before the interview proceeded. The Government, relying on Agent Frysiek's uncontradicted statement at the resumption of the interview following the phone call that Mejia "has agreed to speak with us pending contact by his attorney sometime later this evening," contends that the conversation with Mrs. Arzon was just a request for a later consultation with his lawyer. Intrinsically, it would seem unlikely that a person who has wondered if "I have a right to have my lawyer," and who thereupon tries to phone his lawyer and leaves the number from which he is calling is not actively seeking present professional advice and protection. The fact that Mejia did not take issue with Frysiek's pronouncement that the interview would proceed is not dispositive.

As the Sixth Circuit noted in *United States v. Charlton*, 565 F.2d 86 at page 91: "the mere demonstration that the confession came without objection after a resumption of questioning is inadequate evidence of waiver."

If there is doubt that Mejia was asserting a present right to counsel, at least his position was, within the meaning of the Fifth Circuit's ruling in *Nash v. Estelle*, "equivocal," and under that rule it would then have been appropriate for the interrogating agents "to clarify the course the suspect elects to choose." This was done in *Nash v. Estelle*. It was not done here.

Wherefore, since under the teaching of *Brewer*, courts are obliged to presume against waiver, Mejia must be found not to have surrendered his right to the presence of counsel, a right he was actively seeking to pursue, and his post–arrest statement must be ordered suppressed.

Now, it is appropriate to consider the case of Grullon. Mejia's case is that of a man who signed a form of waiver but also asserted his right to counsel. Grullon's case is, in a sense, the obverse of Mejia's. He said he was willing to talk but he expressly refused to sign a waiver form and bottomed his refusal on his unwillingness to act on the waiver form without the advice of counsel.

Grullon's situation developed this way: First, because of Grullon's inability to speak and understand English, an interpreter was provided, as was quite proper.

Second, considerable time was spent in the exposition to Mr. Grullon of his *Miranda* rights. Much of this exposition was interlarded with (1) reassurance to Grullon that *Miranda* rights were not confined to Americans, (2) reaffirmation that Grullon could start talking without a lawyer and could then stop until a lawyer was present, (3) reading of the complaint.

Third, central to the exposition of Grullon's rights was that he would have to sign the waiver form if he chose to cooperate and speak to his interrogators. I now refer to pages 9 to 10 of the transcript of Grullon's interview. I think this is, again, Mr. Rivera–Soto questioning.

"Q. Now, if you want to give us these rights, and talk to us, I would ask you to sign right here on the bottom, do you understand that?

"A. Si. I have one question. How about if I give up the right to remain silent, what would happen to me if, what, what should I do. Is this gonna hurt me or not?

"Q. It may hurt you and it may not; we are making no promises to you, do you understand that?

"A. That's Mr. Fleisher, I told Mr. Fleisher, that I was gonna cooperate as best I can, all right, all right, cause I'm innocent. If they want to ask me any question of what I'm accused, why I'm accuser, I'm gonna answer any questions. They—would have to explain to me what, you know, what's it about.

"Q. Well before, before we can ask you or explain to you what we're gonna ask you about, we have to make sure that you understand your rights.

"A. Si.

"Q. Do you understand your rights?

"A. Yes, I understand my rights.

"Q. Now, before I can sit down and explain to you what this is all about and to give you the opportunity to cooperate, the—we have to make sure that you are willing to talk to us. And, that you understand that if you do talk to us you will be giving up certain rights; the rights I explained to you. Those rights being the one that I explained to you.

"A. Si.

"Q. Now, if you are willing to cooperate with us, and you wanted to talk to us, you have to give up your rights, and to be able to do that you would have to sign this *waiver form*. Do you understand that?

"A. Si."

Shortly thereafter, Grullon was permitted to telephone his wife. He advised Mrs. Grullon that he was under arrest and asked her to call his brother.

Grullon was also told by Agent Fleisher and presumably repeated to Mrs. Grullon that Mrs. Grullon would not be able to see Mr. Grullon until the following morning at 10:00 a. m.

Fourth, after the phone conversation with Mrs. Grullon the interview proceeded, Grullon stating that he would "talk over here with you in confidential manner. I don't understand the laws of the United States," whereupon, after again being told that he could "stop at any time to talk to a lawyer" and could "pick and choose the questions that you want to answer" Grullon commenced to discuss in a very preliminary way the matters of interest to his interlocutors.

Fifth, after a few initial remarks, references to Mejia, to one Lucas and to an occasion on which the three apparently discussed arms shipments, for the first time Agent Fleisher interrupted to say, "Ah, he didn't sign the waiver yet." Then the following colloquy ensued and this is Agent Fleisher talking:

"We discussed the one here but—you have to sign this before we can hear any more. We went over it before that he can have a lawyer any time, he can pick the questions he wants to answer.

"MR. RIVERA–SOTO: Right, did you explain to him that—that he does not give up his right to a lawyer forever.

"AGENT FLEISHER: I told him that.

"MR. RIVERA–SOTO: Okay, have to tell him that."

Officer Diaz, who was the interpreter, translated in Spanish.

"MR. RIVERA–SOTO: I doesn't matter that he is a foreigner or it doesn't—wait, why don't you listen for a minute, all right. Cause we can't both talk at the same time, okay? Explain that to him. Only one at a time, all right? Okay?

"Mr. Grullon: Yes, mister.

"MR. RIVERA–SOTO: All right, I want you to understand that if you sign the waiver it doesn't mean that you will give up your right to a lawyer forever, okay? It only means that for the purpose of this interview you are permitting us to ask you questions without your lawyer present. Do you understand that?

"MR. GRULLON: Si.

"BY MR. RIVERA–SOTO:

"Q. All right. It also means that for the purposes of this interview you are willing to give up your right to remain silent and are willing to talk to us?

"A. Si—

"Q. Now wait, now wait a minute.

"A. What, what, what do I do?

"Q. All right, the option is up to you, do you understand? We cannot tell you what to do or what not to do, all right? It's up to you whether you want to talk to us or whether you do not want to talk to us. If you do want to talk to us you

have to sign the waiver. If you don't want to talk to us, then we will stop asking you questions and we will take you to be lodged for the night. Or, we can—we can try to get a lawyer, we will not be able to get a lawyer tonight. So, if you want to speak with your lawyer present we will have to stop asking the questions now and we will talk to you sometime tomorrow. But, if you want to talk to us now you will have to give up your rights and sign the form. Do you understand that?

"A. Yes.

"Q. The facts that you—did he say yes to that?

"OFFICER DIAZ: Yes, si, yes.

"BY MR. RIVERA–SOTO:

"Q. The fact that you signed the form, do you understand, listen to what I'm saying. The fact that you signed the form does not mean that you are giving up your rights forever. It only means that for the purposes of this interview tonight, you are permitting us to ask you questions and you will answer our questions without your lawyer present. And, you can also pick and choose whatever questions you may want to answer, and not answer the ones you don't want to. Okay? Do you understand that?

"A. Yes, I do.

"Q. Now,—are you saying yes to us?

"A. I do.

"Q. Yes, you do understand, all right. Do you also understand that you have the right to make one phone call and I understand you already made your phone call? Right, is—

"A. Si.

"Q. —that true?

"A. Yes, I did.

"Q. Okay. Now, do you want to talk to us tonight or not?

"A. I want to talk to you. I don't feel up to signing it. I don't feel up to signing a paper without having a lawyer.

"AGENT FLEISHER: All right, he doesn't have to sign it.

"BY MR. RIVERA–SOTO:

"Q. All right. You are willing to talk but you don't want to sign the paper?

"A. Yes.

"Q. Okay, then we will continue the interview without you having signed the paper, okay? All right?

"A. Okay, si.

"Q. Is that okay with you?

"A. Yes, yes, okay.

"Q. His answer is?

"A. Yes.

"Q. And you understand everything we've told you up to now?

"A. Si.

"Q. The answer is?

"A. Yes.

"Q. Okay, thank you. Now, Agent Fleisher, Agent Fleisher, right here (indicating) will ask you the questions, okay?

"A. (No response).

"Q. And you can answer them or you don't have to answer them, all right. You understand that?

"A. Yes.

"Q. All right, okay. For the record, I'll be leaving."

Thereafter, Grullon went on at considerable length to complete his inculpatory narrative.

The question of law presented is this: Did Grullon "voluntarily, knowingly and intelligently" waive his right to counsel when he said "I want to talk to you. I don't feel up to signing it. I don't feel up to signing a paper without having a lawyer."?

What Grullon said is strikingly like what was said by Ira Nash, Jr. whose post–arrest statement was considered in *Nash v. Estelle*, a recent Fifth Circuit case discussed above. Said Nash: "I would like to have a lawyer but I would rather talk to you." In the Fifth Circuit's view, that "equivocal" statement warranted further police interrogation "to clarify the course the suspect elects to choose," 597 F.2d at 517, an interrogation which satisfied the Fifth Circuit that an appropriate waiver had, in Nash's case, been established.

In Grullon's case there was further clarifying interrogation, as there was not in Mejia's case, which we have already considered. Did that further clarifying interrogation disclose that Grullon "voluntarily, knowingly and intelligently" waived his right to counsel and/or to remain silent? I think not.

In reaching that conclusion, I find the following facts relevant: That Grullon's command of English was negligible, that he had been told that a lawyer could not be appointed until the next day and that his wife could not see him until the next day, and that he had made the one telephone call allowed him.

But the facts which I find controlling are these: Grullon's reason for not signing the waiver was "I don't feel up to signing a paper without having a lawyer." The other controlling fact is that Grullon had been repeatedly told that he could only "cooperate" and talk to his interlocutors if he signed the waiver form. The short of it is that Grullon felt that he could not intelligently determine whether to sign a document described to him as essential to the waiver process without consulting counsel and suddenly without explanation Grullon was advised that he could yield up his rights without signing the form which up to that moment had been an essential ingredient of cooperation and discussion on the merits. Surely at that very point the confusion of a man who had felt he needed a lawyer's advice was only worse confounded.

At the bottom of page 20 of the transcript the question is put to Grullon: "And you understand everything we've told you up to now?" And his recorded answer is: "Si." I think it is impossible to conclude that the "si" reflected a knowing and intelligent understanding of what was signified by the question: "And you understand everything we've told you up to now,?" when everything recapitulated turned out to be laden with the inconsistency of having been told once "You must sign the waiver form if you with to cooperate" and suddenly the signing of the waiver form is no longer necessary.

■ I cannot conclude under such circumstances that the Government has met its "heavy burden"–the burden laid down by *Miranda*–of establishing Grullon's "voluntary, knowing and intelligent" waiver. My view of what the interview transcript shows was for me confirmed by what transpired at the very end of Grullon's interview. On page 46, Agent Fleisher says to Grullon: "Before we stop the tape, is there anything else you want to tell us?"

The answer I'm about to read is in the third person and I interpret this to mean that it is the interpreter attributing to Grullon a statement rather than directly interpreting it.

"A. The first thing he wants to tell you is that was a–first thing, he is a representative of a foreign country, just that he has two people like Armando Mejia and Lukas talk on the telephone and you know about conversations about bringing cocaine to the United States, that doesn't mean you know he's guilty. He has just been with an interview to, you know, help you out as much as he can.

"BY AGENT FLEISHER:
"Q. Fine.
"A. But he doesn't know if he needs a lawyer or not. He's not familiar with the—
"Q. All right, at this point you feel you wanna get a lawyer?
"A. And sure he does.
"Q. All right.
"AGENT FLEISHER: We are going to stop the interview now. For the purpose of getting an attorney at, when the proper time. Before we stop this interview, would you state for the record whether or not you were fairly treated?
"MR. GRULLON: Very good."

Again I want to repeat that so far as I can tell, Mr. Grullon and Mr. Mejia were treated very well, without overbearing, by those who interrogated them. This is not to say that the interview situation is not one of enormous trauma and anxiety, but it is to make a point that both instances–although I conclude that Grullon, like Mejia,

has made a statement which requires suppression–both instances are instances in which the failure to accord the full measure of fair process required by *Miranda* and, hence, the Constitution, was in no sense a willful failure. It was the failure of agents charged with heavy responsibilities but who failed fully to perceive the confusing and confounding and intrinsically–because that is ultimately what *Miranda* is about–coercive atmosphere in which difficult choices are pressed when one person is in custody.

I have said that Mejia's motion to suppress his post–arrest statement was to be granted. I have also said that I have concluded that Grullon, as of page 21 of the transcript of his interrogation, cannot be found, in my judgment, to have waived his *Miranda* rights in a matter that satisfies the mandate of that decision and, therefore, that calls for the suppression of what follows.

I have considered whether there is a brief part of the Grullon statement which can be salvaged. It will be recalled that I pointed out in my summary of the Grullon interview that he did commence some preliminary narratives and answers which could well be viewed as inculpatory. That is on page 14 and runs to the middle of page 17 and that precedes Grullon's confused and, in the language of the Fifth Circuit, "equivocal," assertion both of a willingness to talk and of a desire to have counsel's advice with respect to the waiver form being pressed upon him for signature.

I have considered whether the substantive colloquy on page 997 through 998 could be salvaged but I conclude it cannot. It is prefaced by Grullon saying, "I am going to talk over here with you in confidential manner. I don't know the laws of the United States." Although I find the issue not free from doubt, it seems to me that the word "confidential" itself may be "equivocal" within the meaning of the doctrine of *Nash v. Estelle* as I have discussed it above.

Without further exploration of what, in fact, Grullon intended with respect to his

subsequent statements for that page through page 998, I do not feel entitled to conclude that there is any effective waiver covering that colloquy, most especially so in view of my conclusion that subsequently Grullon quite effectively showed his inability to determine without the advice of counsel just how to proceed.

Accordingly, I will, with respect to Grullon's post–arrest statement, as with respect to Mejia's post–arrest statement, direct the suppression of this statement in its entirety.